IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ARMENAK CHAMLIKYAN, et al., | No. C 10-00268 CRB |
| Plaintiffs, | **ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT AND DENYING PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT** |
| v. | |
| EMILIA BARDINI, et al., | |
| Defendants. / | |

Plaintiffs bring this action against the federal government contesting the decision of the United States Citizenship and Immigration Services ("USCIS")[1] to terminate their asylum statuses. The core of this case concerns whether the government properly terminated Armenak Chamlikyan's asylum because he lied during the application process about whether he knew the whereabouts of his wife and child.

The parties have filed cross motions for summary judgment. The government's motion (dkt. 34) is GRANTED. Plaintiffs' Motion (dkt. 32) is DENIED. The case is closed.

//

//

---

[1] Some of the actions at issue here were actually taken by the Immigration and Naturalization Service ("INS"). The INS has since been divided into several branches, including USCIS, which assumed responsibility for adjudicating asylum applications such as Chamlikyan's. 6 U.S.C. § 271. For simplicity sake, the Court will refer exclusively to USCIS.

## I.     BACKGROUND[2]

Chamlikyan,[3] a citizen of Armenia, filed a form I-589 Request for Asylum on November 14, 1994. AROP at 52. That Request provided, among other things, that "[b]ecause of my nationality I lost my wife, a mother of my the only daughter." Id. at 56. Chamlikyan also said in his I-589 that, in the process of fleeing from Azerbaijan, he lost contact with his wife and "couldn't [find] any information about my wife and I still do not know if she is alive." Id. at 57.

An Asylum Officer reviewed Chamlikyan's I-589 and prepared an Assessment to Grant recommending that Chamlikyan be granted asylum. The Assessment to Grant provided in part as follows:

> Applicant credibly testified that he is an Evangelical Christian (Pentecostal) from Armenia. He testified that because he is a Pentecostal, the police detained, arrested, beat, burned and otherwise physically tortured him. They also psychologically toruted him by forcing him to swear on a bible that his faith was the worst faith. They also told him they would be executing him within a matter of a few days. He has many visible scars on his body. <u>He escaped from police custody and fled to Azerbaijan with his wife and two daughters</u>.
>
> The applicant and his family lived in Azerbaijan for approximately one year and then were forced to flee back to Armenia because Armenians in Azerbaijan were being massacred. <u>His wife and one daughter disappeared in Azerbaijan, and it is presumed they were victims of the massacre</u>. . . .
>
> <u>The acts described by Applicant amount to past persecution on account of religion</u>. He was brutally tortured, and forced to flee his country to protect himself from further torture or execution.
>
> Although it has been determined that the Applicant has not established a well-founded fear of present or future persecution because country conditions have changed, Applicant has demonstrated compelling reasons for being unwilling to return there due to the severity of the past persecution he suffered. Applicant was extremely traumatized by the persecution he suffered.

---

[2] These facts are drawn from the Amended Record of Proceeding ("AROP") lodged with this Court.

[3] The Court adopts the spelling of Mr. Chamlikyan's last name as it appears on the docket. In various court filings and in the AROP his last name also appears at times as "Chamlikian."

2

1  Id. at 49 (emphasis added).

2    The Asylum Officer's recommendation was adopted, and Chamlikyan was granted
3  asylum effective July 10, 1995. Id. at 44. In its letter to Chamlikyan granting asylum,
4  USCIS noted that "[i]t has been determined that you have established a well-founded fear of
5  persecution upon return to your homeland." Id. at 44.[4]

6    Five years later, on July 9, 1999, Plaintiff petitioned the INS, via a form I-730, to
7  accord his wife and children derivative asylum. Id. at 69. That petition was grated on
8  November 10, 1999. Id.

9    On January 31, 2006, USCIS sent a letter to the Director of the San Francisco Asylum
10 Office pointing out possible grounds for termination of Chamlikyan's asylum. In particular,
11 USCIS referred to "new evidence relevant to asylum eligibility discovered during the asylee
12 adjustment process that was not before the Asylum Officer at the time of adjudication." Id.
13 at 41. USCIS noted that, in July 1999, Chamlikyan filed I-730's "for his wife and one
14 daughter whom he claimed had been killed." Id. In addition, USCIS pointed out that
15 Chamlikyan's wife filed her own application for asylum in May 1994 claiming that she
16 entered the United States in September 1993 and that her husband joined her in 1994. Id.

17   On October 25, 2007, USCIS sent Chamlikyan a Notice of Intent to Terminate
18 Asylum Status ("NOIT") pursuant to 8 C.F.R. § 208.24(a)(1).[5] Id. at 31. The NOIT states in
19 relevant part:

> [US]CIS has obtained evidence that indicates fraud in your application for asylum filed on November 14, 1994, such that you were not eligible for asylum at the time it was granted: while you testified on July 6, 1995, that you had no contact or knowledge of your wife's and younger daughter's whereabouts since being attacked

---

[4] There is an obvious inconsistency between the Asylum Officer's determination that "the Applicant has not established a well-founded fear of present or future persecution because country conditions have changed" and the government's ultimate grant of asylum, which provided that "you have established a well-founded fear of persecution upon return to your homeland." Id. at 44, 49 (emphasis added). This inconsistency is irrelevant for purposes of this Court's ruling.

[5] 8 C.F.R. § 208.24(a)(1) provides as follows: "Except as provided in paragraph (e) of this section, an asylum officer may terminate a grant of asylum made under the jurisdiction of an asylum officer or a district director if following an interview, the asylum officer determines that: (1) There is a showing of fraud in the alien's application such that he or she was not eligible for asylum at the time it was granted . . . ."

3

> by anti-Armenian extremists in Azerbaijan in January 1989, you subsequently filed for adjustment of status listing your son, Armayis Chamlikian, who was born in the United States on May 15, 1994, indicating that you had contact with your wife as late as mid-1993.

Id. The NOIT also informed Chamlikyan that a termination interview would be held at least 30 days after the date of the NOIT and that he would have "the opportunity to respond to [the] adverse information." Id.

On November 24, 2009, Plaintiff appeared at the termination interview.[6] At that time, he moved USCIS to stop the termination proceedings because (1) the "reasons" given in the NOIT did not support a finding that Plaintiffs' statuses were subject to termination, and (2) a lack of notice in the NOIT deprived him of a reasonable opportunity to present evidence showing that he was still eligible for asylum. Id. at 13. USCIS did not stop Chamlikyan's asylum termination proceedings or reissue or amend the NOIT.

Chamlikyan appeared at his termination interview and claimed that all information on his I-589 was accurate except his answer that he had not seen his wife since 1989.[7] Id. at 9. It appears that he lied because his wife had already filled out an application for asylum that was itself untruthful, and he was trying to protect her. Id.

Following the termination interview, USCIS terminated Plaintiff's asylum status as well as the status of his derivative asylees. Id. 2. The Notice of Termination of Asylum Status included several findings justifying the decision. For example, it noted that Chamlikyan admitted that he lied about not knowing the whereabouts of his wife and younger daughter. Id. Further, it noted that Chamlikyan's I-589 also indicated that he was widowed, and that in the space for listing wife and children he responded "none." Id.

The Notice of Termination concluded that:

> Your I-730 Refugee/Asylee Petition for your wife and younger daughter are material because you claimed you and your family

---

[6] The termination interview was postponed from November 7, 2007 following Chamlikyan's request for a copy of his form I-589. Id. at 18-19.

[7] Other information on the I-589 concerning Chamlikyan's wife and child was also apparently false, but Chamlikyan claimed at his termination interview that he did not remember providing that information. Plaintiff's counsel has suggested in the briefing that it is possible that the information was incorrectly entered or changed by someone other than Chamlikyan. Id. at 9.

4

>   were persecuted in Armenia because of your religion
>   (Evangelical Christian). Your explanation for the inconsistency,
>   that you lied to protect your wife who you knew at the time had
>   filed a fraudulent asylum application . . . is not reasonable
>   because your wife field an asylum application indicating that she
>   was not dead. As you were aware of this filing it is not
>   reasonable to believe you would protect your wife by telling the
>   Asylum Officer that she was dead.

Id.

\* \* \*

Chamlikyan filed suit in this Court on January 1, 2010 seeking declaratory and injunctive relief claiming that USCIS failed to comply with regulatory and constitutional requirements associated with termination of asylum status. Defendants moved to dismiss for lack of jurisdiction and failure to state a claim. This Court denied the Motion to Dismiss on September 1, 2010. See September 1, 2010 Order (Dkt. 25). The parties then filed these cross motions for summary judgment on October 22, 2010.

## II.  LEGAL STANDARD

The applicable legal standards here include the general summary judgment standard[8] and the standard for review of final agency action. Under the Administrative Procedure Act ("APA"), a court may set aside agency action only if found to be:

(A)  arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law;

(B)  contrary to constitutional right, power, privilege, or immunity;

(C)  in excess of statutory jurisdiction, authority, or limitations, or short of statutory right;

(D)  without observance of procedure required by law;

(E)  unsupported by substantial evidence in a case subject to sections 556 and 557 of this title or otherwise reviewed on the record of an agency hearing provided by statute; or

(F)  unwarranted by the facts to the extent the facts are subject to trial de novo by the reviewing court.

---

[8] See Fed. R. Civ. P. 56. The parties seem to agree that this matter is appropriate for disposition at the summary judgment stage.

5 U.S.C. § 706(2).

## III.  DISCUSSION

### A.  The NOIT Complied with 8 C.F.R. § 208.24(c) and Due Process Requirements

Chamlikyan's first argument concerns the NOIT. He claims that it failed to comply with 8 C.F.R. § 208.24(c). That regulation provides as follows:

> Prior to the termination of a grant of asylum or withholding of deportation or removal, the alien shall be given notice of intent to terminate, with the reasons therefor, at least 30 days prior to the interview specified in paragraph (a) of this section before an asylum officer. The alien shall be provided the opportunity to present evidence showing that he or she is still eligible for asylum or withholding of deportation or removal. If the asylum officer determines that the alien is no longer eligible for asylum or withholding of deportation or removal, the alien shall be given written notice that asylum status or withholding of deportation or removal and any employment authorization issued pursuant thereto, are terminated.

Id.

Chamlikyan argues that the NOIT failed to comply with section 208.24(c) because it did not provide the "reasons" USCIS intended to terminate his status, and Chamlikyan was in fact terminated for reasons not included in the NOIT. Chamlikyan's argument is without merit because the NOIT did provide the reason USCIS intended to terminate his asylum status – misrepresentations about his knowledge of his wife's and child's whereabouts at the time of the asylum interview – and his status was terminated for that reason.

The NOIT provided in relevant part that, "while you testified on July 6, 1995, that you had no contact or knowledge of your wife's and younger daughter's whereabouts since being attacked by anti-Armenian extremists in Azerbaijan in January 1989, you subsequently filed for adjustment of status listing your son, Armayis Chamlikyan, who was born in the United States on May 15, 1994, indicating that you had contact with your wife as late as mid-1993." AROP at 31. Thus, the NOIT explained the "reason" USCIS intended to terminate asylum status: Chamlikyan provided false information as to his knowledge about his wife's and daughter's whereabouts when he applied for asylum.

6

This case is thus distinguishable from cases in which NOITs have been found to provide insufficient notice. For example, in <u>Singh v. Bardini</u>, a district found a NOIT to be defective where it referred only in vague generalities to the alleged fraud and did not make clear what the allegedly false information was. No. C-09-3382 EMC, 2010 WL 2292320, at *5 (N.D. Cal. Jun 7, 2010); <u>see also</u> <u>Sidhu v. Bardini</u>, C 08-05350 CW, 2009 WL 1626381 (N.D. Cal. June 10, 2009). Here, the NOIT made clear that the alleged falsehood was Chamlikyan's statement that he did not know the whereabouts of his wife and child.

Chamlikyan also asserts that NOIT did not comply with notice requirements because it did not refer to the I-730 forms he filed on his wife's and daughter's behalf, and USCIS ultimately relied on those forms in terminating his status. This argument improperly focuses on the particular <u>evidence</u> USCIS referred to in support of its determination that Chamlikyan was untruthful rather than on the <u>reason</u> for termination. Indeed, Chamlikyan's argument is odd because he admitted during his termination interview that he was untruthful during the asylum application process. The failure to mention specific pieces of evidence in the NOIT that ultimately supported a determination that Chamlikyan agreed with (that he lied about not knowing the whereabouts of his wife and daughter) was not, under these circumstances, a violation of 8 C.F.R. § 208.24(c).[9]

### B. Substantial Evidence Supports USCIS's Decision to Terminate Asylum Status

#### 1. The Grant of Asylum

Chamlikyan argues that USCIS violated its own regulations and made a decision unsupported by substantial evidence in terminating his asylum status. In particular, he asserts that any misrepresentations he made about his wife's and daughter's whereabouts during the asylum application process were immaterial to USCIS's decision to grant asylum in the first place. He supports this argument with a narrow focus on the Asylum Officer's

---

[9] The Court also cannot find a due process violation here. Chamlikyan was informed of USCIS's basis for seeking to terminate his asylum status. He was given years to prepare for a termination interview. He admitted in substance at that interview that he was dishonest in the manner alleged by the government. His asylum status was terminated for that reason. The due process requirement does not compel the government to do more. See <u>Mathews v. Eldridge</u>, 424 U.S. 319, 333 (1976).

7

expressly articulated basis for granting asylum: the fact that Chamlikyan suffered religious persecution in Armenia.[10]

The Asylum Officer's Assessment to Grant shows that he recommended Chamlikyan for asylum based on "past persecution on account of religion." AROP at 49. The Assessment to Grant also provides that the religious persecution occurred in Armenia and was based on Chamlikyan's testimony (which was deemed credible) recounting physical and psychological torture that he himself suffered. Id. The Asylum Officer also recounted Chamlikyan's story, which the Asylum Officer also apparently found credible, that, after Chamlikyan fled to Azerbaijan to escape religious persecution in Armenia, he and his family were subjected to ethnic persecution forcing them to flee back to Armenia. In the course of fleeing from the ethnic persecution in Azerbaijan, Chamlikyan lost track of his wife and daughter, and he told the Asylum Officer that he did not know their whereabouts. The Asylum Officer "presumed" the wife and daughter were victims of an ethnic massacre in Azerbaijan.[11] Id.

### 2. USCIS's Decision to Terminate Asylum Status

The Notice of Termination explained the reason USCIS terminated asylum as being Chamlikyan's misrepresentations about knowledge of his wife's and daughter's whereabouts which "were material because you claimed you <u>and your family</u> were persecuted in Armenia because of your religion." Id. at 2 (emphasis added).

//

---

[10] As mentioned above, there is some uncertainty as to whether Chamlikyan was granted asylum pursuant to 8 C.F.R. 208.13(b)(1)(iii)(A) (providing for asylum, even in the <u>absence</u> of a well-founded fear of future persecution, where "[t]he applicant has demonstrated compelling reasons for being unwilling or unable to return to the country arising out of the severity of the past persecution.") or 8 C.F.R. 208.13(b)(2) (well-founded fear of persecution). The Asylum Officer determined that Chamlikyan <u>failed</u> to demonstrate a well-founded fear of future persecution (because of changed country conditions) but nevertheless recommended asylum because of "compelling reasons for [his] being unwilling to return to [] due to the severity of the past persecution he suffered." AROP at 49. In the actual grant of asylum, however, USCIS – perhaps as a result of inadvertence or perhaps because it disagreed with the Asylum Officer – said that the grant of asylum was because "you have established a well-founded fear of persecution on return to your homeland." Id. at 44.

[11] USCIS's internal memo starting the investigation into whether Chamlikyan committed asylum fraud states that Chamlikyan was granted asylum "based on his claimed fear of being killed in Armenia due to his religion or being killed in Azerbaij[an] due to his ethnicity." Id. at 41.

8

### 3.     **Substantial Evidence Supported USCIS's Decision**

To terminate asylum, USCIS needed to establish by a preponderance of the evidence that Chamlikyan's asylum status was subject to termination pursuant to 8 C.F.R. § 208.24(a)(1) (showing of fraud such that he was not eligible for asylum at the time it was granted).  This Court's review of USCIS's decision is limited to whether "substantial evidence" exists to support it.  <u>Hernandez v. Mukasey</u>, 345 F.3d 824, 832 (9th Cir. 2003); <u>Immigration & Naturalization Serv. v. Elias-Zacarias</u>, 502 U.S. 475, 481 (1992).  In the Court's view, substantial evidence does exist to support the decision.

Substantial evidence exists to support USCIS's decision to terminate asylum becuase Chamlikyan's misrepresentations about not knowing the whereabouts of his wife and daughter were material to USCIS's decision to grant him asylum.  Although the Asylum Officer did not expressly say that his recommendation to grant asylum was based on a finding of ethnic persecution in Azerbaijan, he recounted Chamlikyan's story about fleeing back to Armenia and losing track of his wife and daughter in the process.  The Asylum Officer clearly "presumed" the wife and daughter were killed in the ethnic massacre.  It strains credulity to believe that the Asylum Officer was unaffected by this story when he chose to recommend asylum or that USCIS ultimately reached its decision without considering the loss of his wife and child as a material fact.

It is true that the religious persecution occurred in Armenia and not Azerbaijan and that at least the Asylum Officer based his recommendation to grant on the past persecution Chamlikyan suffered on his own part in Armenia.  However, the Asylum Officer was no doubt influenced by the story of flight in Azerbaijan.  Indeed, he bothered to recount it in his relatively short Assessment to Grant.  Further, the ultimate grant of asylum did find a well-founded fear of persecution, and considering that the Asylum Officer expressly rejected that determination for Armenia, it seems likely that USCIS based that determination at least in part on past (and a fear of present) ethnic persecution in Azerbaijan.  <u>See</u> Asylum Termination Memorandum (AROP 41) ("[Chamlikyan] was granted asylum . . . based upon his claimed fear of being killed in Armenia due to his religion <u>or being killed in Azerbaijan</u>

9

due to his ethnicity.") (emphasis added).  Thus, substantial evidence supports the conclusion that Chamlikyan's misrepresentation was "material" because it either influenced the Asylum Officer to recommend asylum notwithstanding a lack of a well-founded fear of future persecution and/or influenced USCIS to grant asylum based on a well-founded fear of persecution in Azerbaijan.  This was not a minor or technical misrepresentation.  It was a critical part of Chamlikyan's story.

Chamlikyan also challenges particular findings as unsupported by substantial evidence.  For example, he asserts that there is insufficient evidence to support a conclusion that he ever said that his wife was dead.  The problem with this argument is that, even if Chamlikyan is right, it does not establish a violation of 208.24(c). The Asylum Officer reported Chamlikyan's story as being that his wife and child "disappeared in Azerbaijan" and were "presumed" to be "victims of the massacre."  AROP at 49.  Even if Chamlikyan did not expressly say that his wife and child were dead, by representing that he did not know their whereabouts he at least allowed the Asylum Officer and USCIS to reach the (false) impression that they were probably killed in an ethnic massacre.  The question before this Court is whether USCIS's ultimate determination that Chamlikyan committed asylum fraud is supported by substantial evidence, not whether each and every subsidiary determination USCIS might have made also meets that standard.

### C.     The Court Rejects Chamlikyan's Laches Defense

Chamlikyan argues that the government is barred from terminating his asylum because it had evidence of the fraud as much as a decade before the NOIT.  On its face this is a fairly compelling argument, but laches is typically not available as a defense to government action. See Costello v. United States, 365 U.S. 265, 281 (1961).

Some courts have permitted laches defenses against the government in limited situations.  For example, at least two Circuit Courts of Appeal have said that laches may be asserted against the United States in three main situations: (1) where the delay is egregious; (2) when there is no relevant statute of limitations; or (3) when the government seeks to

enforce private rights. Cayuga Indian Nation of N.Y. v. Pataki, 413 F.3d 266, 278-79 (2d Cir. 2005) (agreeing with Seventh Circuit).

Here, the government's delay is borderline egregious. Chamlikyan filed the form I-730 seeking derivative asylum for his wife in November 1999. Even before that he had apparently filed for an adjustment of status indicating that his wife was not deceased. The government did not issue the NOIT until October 2007. However, Costello provides that "delay which might support a defense of laches in ordinary equitable proceedings between private litigants will not bar a denaturalization proceeding brought by the Government." 356 U.S. at 281; see also Alvarado v. Attorney General of U.S., No. 09-4432, 2010 WL 4892861, at *2-*3 (3d Cir. Dec. 2, 2010) (McKee, concurring) (criticizing government for failing to offer an explanation for delaying an asylum interview for years but reluctantly concluding that the defense of laches was unavailable).

Accordingly, although the Court is troubled by the unexplained delay in the government's issuance of a NOIT in this case, it declines to bar the action on the ground of laches.

## IV. CONCLUSION

Defendants' Motion for Summary Judgment is GRANTED. Plaintiffs' Motion for Summary Judgment is DENIED. The government has satisfied the Court that it complied with regulation and constitutional law in connection with terminating Chamlikyan's asylum status. Further, substantial evidence supports USCIS's ultimate finding that Chamlikyan committed asylum fraud warranting termination of asylum status. Finally, although the government's delay in initiating termination proceedings is troubling and difficult to understand, the Court declines to accept a defense of laches.

**IT IS SO ORDERED.**

Dated: December 13, 2010

CHARLES R. BREYER
UNITED STATES DISTRICT JUDGE